UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                              :

ERIK FORMAN,                                  :

                                        :

                     Plaintiff,          :

                                        :             19 Civ. 8156 (JPC)

           -v-                           :

                                        :           OPINION AND
                                        :             ORDER

NEW YORK CITY DEPARTMENT OF EDUCATION,  :
*et al.*,                                     :

                                        :

                     Defendants.       :

                                        :
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Plaintiff Erik Forman, a former teacher at the High School of Language and Innovation ("HSLI") in the Bronx, brings this action against his prior employer, the New York City Department of Education ("DOE"), and HSLI's principal and an assistant principal. Forman alleges that Defendants retaliated against him for raising issues with the school's administration, as well as for union-related activities including as his union's chapter leader, in violation of the First Amendment. He further alleges that this retaliation resulted in a hostile work environment for him and amounted to a constructive discharge from HSLI.

      Many of the instances of speech that Forman cites are not protected by the First Amendment because they fell within the scope of his duties as a public employee. Forman also has not proffered evidence of any adverse employment actions under the law, nor a causal link between his speech and what he alleges were adverse employment actions. The Court therefore grants Defendants' motion for summary judgment in its entirety.

## I. Background

### A. Facts[1]

Forman's allegations in this case concern comments made to him by senior officials at HSLI, and actions taken by them including a performance review, during his employment with DOE. He claims that those officials retaliated against him for voicing concerns at the school and for his activities with his union, the United Federation of Teachers.

#### 1. Forman's Relevant Employment History and Union Activities

Forman was hired by HSLI's principal, Julie Nariman, in July 2014 to work as an English as a Second Language ("ESL") Teaching Fellow. Pl. 56.1 Stmt. ¶ 5. Soon after Forman started at HSLI, the school's assistant principal, Yan Wang, allegedly commented that "some people spend to[o] much time on union activities." *Id.* ¶ 6; Blair Decl., Exh. D ("Pl. Interrog.") at 8. Almost a year later, in May 2015, a different assistant principal, Shira Wrightman, told Forman that "something might happen to" him if he ran for his union's Chapter Leader. Pl. 56.1 Stmt. ¶ 7; Pl. Interrog. at 8; *see* Blair Decl., Exh. B ("Forman Dep. Tr.") at 40:11-24 (testifying that Wrightman made this comment after Forman had mentioned to another colleague that he was running for Chapter Leader). While Forman claimed at his deposition that Wrightman was acting as an agent for Nariman when she made that statement, *id.* at 41:11-14, he could not recall any comments Nariman herself made to discourage him from running for the Chapter Leader position, *id.* at 41:15-17. Pl. 56.1 Stmt. ¶ 7.

---

[1] These facts are mainly drawn from Defendants' statements of material facts under Local Civil Rule 56.1, Dkt. 45 ("Blair Decl." or "Blair Declaration"), Exh. 1 ("Deft. 56.1 Stmt."), Forman's counter-statement under Rule 56.1, Dkt. 66 ("Pl. 56.1 Stmt."), and the declarations including attached exhibits filed by the parties. Unless otherwise noted, the Court cites only to Forman's counter-Rule 56.1 statement when the parties do not dispute the fact, Forman has not offered admissible evidence to refute that fact, or Forman simply seeks to add his own "spin" on the fact or otherwise dispute the inferences from the stated fact.

Almost a year after he was hired, in June 2015, Forman emailed Nariman to inform her that he decided to run for the United Federation of Teachers Chapter Leader for HSLI. *Id.* ¶ 8. He told Nariman that he "wanted to assure [her]" that he was not "frustrat[ed]" with the workplace. Blair Decl., Exh. E. Instead, he was "happy at HSLI[] and believe[d] [that they] ha[d] healthy professional relationships at [HSLI]." *Id.* A day later, Forman was elected Chapter Leader for the school. Pl. 56.1 Stmt. ¶ 9.

In September 2015, about three months after his election as Chapter Leader, Forman represented another teacher at a grievance meeting with Nariman. *Id.* ¶ 19. That same month, Nariman allegedly told Forman that he needed to "decide what [his] priorities are" and should consider resigning as the school's Community Outreach Lead because of his Chapter Leader position. *Id.* ¶ 20; Pl. Interrog. at 8. Around the same time, Wang allegedly repeated her comment that "some people spend too much time on their union duties." Pl. 56.1 Stmt. ¶ 20; Pl. Interrog. at 8. A month later, Nariman recommended Forman for the Fulbright U.S. Student Program in China. Pl. 56.1 Stmt. ¶ 21. Then in March 2016, Nariman allegedly said, in substance, that the United Federation of Teachers can be "divisive," and teachers should bring problems directly to the administration rather than discussing them with union representatives. *Id.* ¶ 25; Pl. Interrog. at 8.

A few events of significance to Forman's claim occurred shortly thereafter. On March 28, 2016, an incident occurred at the school involving a student with scissors. Blair Decl., Exh. N. at 2-3. Forman contends that he observed two students fighting in the hallway and separated them. *Id.* at 2. He ushered one of the students into a classroom as he called for assistance. *Id.* According to Forman, that student then grabbed scissors from a cart and rushed toward the other student, trying to stab him. *Id.* Forman claims that he physically restrained the aggressor and brought him

back to the classroom until senior officials arrived.  *Id.*  Yang then took statements from witnesses.
*Id.*

Following that incident, Forman organized teachers to submit a safety complaint.  Pl. 56.1
Stmt. ¶ 28.  What appears to have prompted Forman to draft that complaint was his belief that the
school had not treated the incident as seriously as it should have, relying on accounts that differed
from his own.  *Id.* ¶¶ 29, 31; Blair Decl., Exh. N at 2.  While Forman alleges that the student took
scissors from his classroom and tried to stab another student, the school reported the incident in its
internal communication system as the student merely waving around the scissors.  Pl. 56.1 Stmt.
¶ 29.  The school therefore classified the incident as an infraction that "[c]reat[ed] a substantial
risk of serious injury."  Blair Decl., Exh. N at 2.

On April 8, 2016, Forman delivered to Nariman the safety complaint, which he co-signed
with seven other teachers.  *Id.* at 1-4; Pl. 56.1 Stmt. ¶ 30.  The complaint started by detailing
Forman's account of the event and his view that the school mischaracterized what happened.  Blair
Decl., Exh. N at 2.  It then said that "when [Forman] . . . explained [to Nariman] that [the student]
had tried to stab another student, she said there are multiple accounts, implying that the teachers
who witnesse[d] the event and had to physically restrain [the student] were not telling the truth."
*Id.* at 3.  The complaint further stated that "[t]he staff feels" that the school misclassified the event,
which has "seriously torn the fabric of trust that is essential to maintaining a healthy relationship
between administration and staff, and crucial to maintain[ing] a safe learning environment for
students."  *Id.*  Forman testified at his deposition that Nariman's behavior towards him changed
after he submitted that safety complaint.  Forman Dep. Tr. at 57:18-21; *see* Pl. 56.1 Stmt. ¶ 37.

In a letter dated April 7, 2016, presumably after Forman began discussing the scissors
incident with other teachers but just before his delivery of the safety complaint to Nariman,

Nariman informed Forman that she was "scheduling a disciplinary meeting with [Forman] regarding professional conduct." Blair Decl., Exh. M; Pl. 56.1 Stmt. ¶ 26. In the letter, Nariman asked Forman to notify his union representative of the disciplinary meeting and to schedule an appointment with her within a week. Blair Decl., Exh. M; Pl. 56.1 Stmt. ¶ 26. Nariman later testified about this matter at a March 27, 2018 hearing before the New York Public Employment Relations Board in an administrative action brought by Forman.[2] When asked at the hearing why she did not issue Forman a disciplinary letter, Nariman explained she felt a warning was appropriate given that Forman was still relatively new to the school:

> I felt that . . . it was better to give him a warning. I felt that he was a second year teacher and may not have known what the proper protocols were for investigating safety issues and that it's not, it's not appropriate to ask other staff members what they wrote in their statements or to imply that the statements should be corroborated. I felt . . . maybe as a relatively new teacher he didn't know that. I did want to have a meeting with his union representative because I felt he did deserve that representation. I didn't want to question him without a representative present. That is his right as a union member. But after the meeting I did believe that he didn't know what he was doing was inappropriate and the meeting itself was enough to help him understand that and I didn't want to give him a harsh consequence as a relatively new teacher.

Blair Decl., Exh. I at 908:21-909:19.[3]

A safety meeting was held on April 12, 2016.[4] During that meeting, Nariman allegedly told the teachers that they "should be teaching now!" Pl. 56.1 Stmt. ¶ 32; Pl. Interrog. at 8. She

---

[2] On October 10, 2016, Forman filed an improper practice charge with the New York State Public Employment Relations Board alleging retaliation for his union activities. Pl. 56.1 Stmt. ¶ 61.

[3] While not made clear by the parties' submissions, or by the limited excerpt of the hearing attached to the Blair Declaration, the Court assumes that the "professional conduct" issue that gave rise to this disciplinary meeting concerned Forman's discussions with other teachers following the scissors incident and his efforts to rally them to join in the safety complaint.

[4] The Court assumes that this "safety meeting" that the parties discuss in their filings is different from the previously mentioned disciplinary meeting that Nariman convened for Forman.

also allegedly said that the union should not divide staff from the school's administration and that teachers should bring problems directly to the administration. Pl. 56.1 Stmt. ¶ 32; Pl. Interrog. at 8. Two days later, Nariman allegedly interrogated Forman and told him that asking other teachers and staff about safety issues in the school violated a "confidentiality" policy. Pl. Interrog. at 8; *see* Pl. 56.1 Stmt. ¶ 33.

Five days later, Nariman informally observed Forman teaching. He then received six "developing" and two "effective" observation scores. *Id.* ¶ 34. Forman testified at his deposition that Nariman had been working with him earlier in the semester on his teaching, and that "her verbal feedback [was that he] did well and the written [feedback] was this is the worst lesson [he] ever taught." Forman Dep. Tr. at 85:9-13; *see* Pl. 56.1 Stmt. ¶ 35. Forman testified that he believed these observations were done in retaliation for him running for Chapter Leader and his advocacy in that role. Forman Dep. Tr. 60:1-7; *see* Pl. 56.1 Stmt. ¶ 36.

On July 12, 2016, Forman emailed Nariman, Wang, and Wrightman with ideas for community outreach during the upcoming school year. Blair Decl., Exh. W at 1; Pl. 56.1 Stmt. ¶ 55. In this email, Forman expressed his desire to continue as Community Outreach Lead and build upon his prior work in that role. Blair Decl., Exh. W at 1. Wang responded six days later, copying Nariman and Wrightman. *Id.* Wang explained that while HSLI's administration was "enthusiastic about" Forman's ideas, their "priority is student learning and supporting [the] students in graduating." *Id.*; *see* Pl. 56.1 Stmt. ¶ 55. To that end, Wang noted the administration's "alarm[]" that less than 25% "of the [twelfth-]grade cohort" passed the U.S. History Regents Exam, and advised that the school would change fall programming, as the school's "student performance data in this particular Regents exam has never been so low." Blair Decl., Exh. W at 1; *see* Pl. 56.1 Stmt. ¶ 55. She further informed Forman that, "as a teacher who earned a

6

Developing in Measures of Teacher Practice, [he would] get to focus on teaching and improving [his] practice so that [HSLI] students can have the best possible outcomes." Blair Decl., Exh. W at 1; Pl. 56.1 Stmt. ¶ 55.  In light of those priorities, Wang informed Forman that the administration would not be assigning him to be Community Outreach Lead for the 2016-2017 school year, out of "concern[] that a focus on community outreach will negatively impact [Forman's] teaching, [HSLI] students, and [HSLI]." Blair Decl., Exh. W at 1.  Wang concluded the email by offering to meet with Forman to discuss "student learning outcomes, as well as their implications for [his] teaching and upcoming tenure year." *Id.*; Pl. 56.1 Stmt. ¶ 55.

Shortly after this email exchange with Wang, Forman began exploring other teaching opportunities.  On August 4, 2016, Forman informed Nariman that he was considering taking a leave of absence for the 2016-2017 school year because he had an opportunity to teach in Syria. Pl. 56.1 Stmt. ¶ 39.  Nariman responded by saying that she approved his leave and that he would also need a DOE leave specialist to approve it.  *Id.* ¶ 42.  Also on August 4, Forman applied for an ESL position at Q950 Pathways to Graduation.[5]  *Id.* ¶ 40.  The next day, Forman sent a letter requesting personal leave for the 2016-2017 school year "to adjust personal affairs" and explaining that he had an invitation to serve as an ESL teacher in Syria.  Blair Decl., Exh. R; Pl. 56.1 Stmt. ¶ 40.  On August 19, Forman received an offer to teach ESL at The City College of New York's ("CUNY") Language Immersion Program ("CLIP") during the Fall 2016 semester and as a tutor and substitute teacher with CLIP during the Spring 2017 semester.  Pl. 56.1 Stmt. ¶ 43.  Five days

---

[5] According to the program's website, Pathways to Graduation is a full-time, free DOE program that "provides students with the preparation and tools needed for a successful future by helping them earn their High School Equivalency Diploma." http://p2g.nyc/about/ (last visited Mar. 22, 2022).

later, Forman sent Nariman an email informing her that DOE had just approved his leave request and thanking her for supporting that request.  Blair Decl., Exh. U; *see* Pl. 56.1 Stmt. ¶ 45.

On August 28, 2016, in an email chain among Nariman, Wang, and Wrightman, Wrightman wrote that they "should do what [they] can on [their] end to minimize inflammatory emails by temporarily removing [Forman] from the domain for the year."  Dkt. 78-72 at 8.  On August 30, Forman's HSLI staff email account was deactivated, allegedly by Nariman and Wang. Pl. 56.1 Stmt. ¶ 46; *see also* Dkt. 78-72 at 2, 8.  The next day, Forman used another account to email Nariman to say that he was having problems accessing his email.  Blair Decl., Exh. V at 1; *see* Pl. 56.1 Stmt. ¶ 47.  Nariman responded by apologizing for "the email glitch" and explaining that to ensure that the school had "a clean 'staff' email chain and platform, [the school] will deactivate [his] account while [he was] on leave, but will do so in 2 weeks so [he would] have a chance to get any documents [he] need[s] and close things out."  Blair Decl., Exh. V at 1; *see* Pl. 56.1 Stmt. ¶ 56.

In his August 31 email, Forman also asked Nariman whether she wished for him to return to HSLI after his leave: "[I]f you do not want me to return to HSLI next year, I would certainly like to know that and would pursue employment at other schools if that is the case. . . .  I want to invite you to be candid with me, I will not take offense and would appreciate knowing so that I can make career plans accordingly."  Blair Decl., Exh. V at 1.  Nariman responded that she "appreciate[d Forman's] request for candor," and said that she "believe[d] another setting would be a better fit for [Forman's] interests and strengths as a teacher."  *Id.*; Pl. 56.1 Stmt. ¶ 59.  She added that if Forman was "on the same page, [she would] support [him] in making the move."  Blair Decl., Exh. V. at 1.

The school then temporarily reactivated Forman's HSLI email, allowing him to retrieve his files. Pl. 56.1 Stmt. ¶¶ 58, 60. A few weeks later Wang emailed Forman to let him know that the school would "be deleting all current non-HSLI teachers' emails by the end of next Friday, 9/30." Blair Decl., Exh. V at 2; Pl. 56.1 Stmt. ¶ 60. But Forman's official DOE email account was not deactivated. Pl. 56.1 Stmt. ¶ 58. Forman claims, however, that his lack of an HSLI email account complicated his efforts to apply for jobs with DOE because it appeared that he was not able to write from his work email account. *Id.* ¶ 57.

In the spring of 2017, Forman applied for several jobs with DOE. *Id.* ¶¶ 62-67. But Forman instead accepted a job offer from the State University of New York ("SUNY") to serve as an Adjunct Instructor in Labor Studies for the Fall 2017 semester. *Id.* ¶¶ 68, 70. After receiving the job offer from SUNY, Forman applied to extend his leave with DOE from September 5, 2017 through June 30, 2018, which DOE approved. *Id.* ¶¶ 69-70. Similar events happened for the 2018-2019 school year[6]: Forman accepted a job at SUNY to serve as an Adjunct Instructor in Labor Studies, prompting Forman to extend his DOE leave from September 4, 2018 through June 30, 2019. *Id.* ¶¶ 71-73. In May 2019, Forman notified DOE and Nariman that he would resign from DOE effective June 30, 2019. *Id.* ¶¶ 74-75. Forman testified at his deposition that he resigned because he believed he had reached the maximum number of years he could be on leave and that, if he could have continued his leave of absence, he "probably" would have. Forman Dep. Tr. at 88:22-89:4; *see* Pl. 56.1 Stmt. ¶ 75. As of July 2020, Forman remained employed by SUNY. Forman Dep. Tr. at 19:2-10; *see* Pl. 56.1 Stmt. ¶ 76.

---

[6] The parties' Rule 56.1 statements accidentally list the events in paragraphs 71 through 75 under headings that are one year earlier than the events happened.

### 2. Forman's Annual Reviews

As indicated above, Forman's claim of retaliation against Defendants involves performance ratings he received for the 2015-2016 school year in his annual professional review. The Court provides some background on the review process before turning to Forman's reviews.

Each year, teachers are evaluated based on an Annual Professional Performance Review, and receive what is called an *Advance* overall rating. *Id.* ¶ 11. That rating is based on a four-point scale of high effective, effective, developing, and ineffective (forming the acronym, "HEDI"). *Id.* A teacher's overall rating consists of two components. First is the Measures of Teachers Practice ("MOTP"), which is based on observations of the teacher throughout the school year and accounts for sixty percent of a teacher's performance rating. *Id.* ¶¶ 12-13. The rest of the overall rating is composed of the Measures of Student Learning ("MOSL"), which tracks student academic growth and has a state and local component. *Id.* ¶¶ 12, 14. The state component (worth twenty percent of the rating) looks at student growth on state tests and certain school-chosen tests. *Id.* ¶ 14; Blair Decl., Exh. F at 10-11. The local component (worth the remaining twenty percent of the rating) looks at student growth for school-wide assessments or those chosen by a local committee. Pl. 56.1 Stmt. ¶ 14; Blair Decl., Exh. F at 10-11. These scores yield a numerical rating on a 100-point scale ("HEDI Points"), which translates into an overall rating on the high effective, effective, developing, and ineffective scale. Blair Decl., Exh. G at 2; *see* Pl. 56.1 Stmt. ¶ 15.

The below table shows Forman's ratings throughout his time at HSLI:

| School Year | MOTP (HEDI Points) (MOTP Score) | State MOSL (HEDI Points) | Local MOSL (HEDI Points) | Overall Rating (HEDI Points) |
|---|---|---|---|---|
| 2014-2015 | 45 (effective) 2.55 | 16 (effective) | 16 (effective) | 77 (effective) |
| 2015-2016 | 44 (developing) 2.42 | 14 (developing) | 16 (effective) | 74 (developing) |

Pl. 56.1 Stmt. ¶¶ 18, 50-52; Blair Decl., Exh. H at 31-33, Exh. L at 26-29.  Forman received his overall rating for the 2015-2016 school year on September 1, 2016.  Pl. 56.1 Stmt. ¶ 48.  Forman claims that because of his "developing" rating for that school year, he could not secure a teaching position at DOE in the summer of 2017 at the conclusion of his voluntary leave for the 2016-2017 school year.  *Id.* ¶ 54.

**B.  Procedural History**

In August 2019, Forman sued DOE, Nariman, and Wang, alleging a First Amendment retaliation claim under 42 U.S.C. § 1983, including through a hostile work environment and a constructive discharge.  Dkt. 2 ("Complaint") ¶¶ 52-53.  Plaintiff alleges that Defendants retaliated against him because he ran for and served as the United Federation of Teachers Chapter Leader for HSLI; convened union meetings; raised issues about staffing, instruction, the curriculum, and collaboration at the monthly consultation meetings with Nariman; objected to member selections for an unspecified school committee; and filed a safety complaint with other teachers about a student incident, *i.e.*, the March 28, 2016 scissors incident.  *Id.* ¶¶ 2-3, 18-19, 23, 34, 53; *see* Pl. 56.1 Stmt. ¶ 2.

Defendants previously moved to dismiss as time-barred any claims that accrued before August 30, 2016.  *See* Dkts. 11, 18.  On September 16, 2020, the Honorable Analisa Torres, to whom this case was then assigned, granted the partial motion to dismiss, finding that section 1983's three-year statute of limitation barred Forman's "claims relating to acts that occurred before August 30, 2016."  Dkt. 33 ("9/16/20 Opinion") at 3.  In reaching that holding, Judge Torres found that the "[d]isciplinary proceedings and poor performance evaluations are 'discrete acts' that do not trigger the continuing violation doctrine," so all those allegations are time-barred.  *Id.* (quoting *Valtchev v. City of New York*, 400 F. App'x 586, 589 (2d Cir. 2010)).

11

With discovery now concluded,[7] Defendants have moved for summary judgment on Forman's remaining claims. *See* Dkts. 44, 46 ("Motion"), 73 ("Reply"). Forman opposes the motion. *See* Dkt. 65 ("Opposition").

## II. Legal Standards

A court should grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine factual dispute exists, a court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). The moving party is entitled to judgment as a matter of law when "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In deciding a motion for summary judgment, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Spinelli v. City of New York*, 579 F.3d 160, 166 (2d Cir. 2009) (quotations omitted).

Forman is proceeding *pro se*. "When a *pro se* litigant is involved, the same standards for summary judgment apply, but the *pro se* litigant should be given special latitude in responding to a summary judgment motion." *Roundtree v. New York City*, No. 15 Civ. 8198 (JPC), 2021 WL 4504471, at *4 (S.D.N.Y. Sept. 30, 2021) (quotations omitted). The Court therefore has read

---

[7] On February 4, 2021, the Court granted Forman's request to reopen discovery in part, ordered Defendants to conduct certain additional email searches, and stayed briefing on Defendants' summary judgment motion so that any responsive documents located during those searches could be produced to Forman. Dkt. 62.

12

Forman's pleadings "liberally and [has] interpret[ed] them to raise the strongest arguments that they suggest." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quotations omitted). This principle, however, has limits and "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Recs.*, 351 F.3d 46, 50 (2d Cir. 2003) (quotations omitted). "A pro se party's bald assertions unsupported by evidence are thus insufficient to overcome a motion for summary judgment." *Roundtree*, 2021 WL 4504471, at *4 (quotations omitted).

### III. Discussion

Section 1983 creates a federal right of action against any person who, acting under color of state law, deprives anyone of a right created by the U.S. Constitution or federal law. 42 U.S.C. § 1983. Here, each Defendant qualifies as a "person" under section 1983 and is alleged to have acted under color of state law.[8] The Court therefore must determine whether Defendants unconstitutionally retaliated against Forman. "To survive a motion for summary judgment on a First Amendment retaliation claim in the public employment context, the plaintiff must present evidence which shows [1] that the speech at issue was protected, [2] that he suffered an adverse employment action, and [3] that there was a causal connection between the protected speech and

---

[8] The New York City Department of Education, as part of a municipality, counts as a "person" under section 1983. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). To hold a municipality liable for its employees' unconstitutional actions, a plaintiff must show a municipal policy or custom that directly caused the plaintiff to experience a constitutional violation. *See id.* at 691; *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). Because the Court finds no constitutional violation, the Court need not address whether Forman has proffered evidence to support municipality liability under *Monell*. *See Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct.").

In the same vein, because Nariman and Wang "did not violate [Forman]'s constitutional rights, [the Court] need not address whether they are entitled to qualified immunity." *Kelsey v. City of New York*, 306 F. App'x 700, 703 (2d Cir. 2009).

the adverse employment action." *Nagle v. Marron*, 663 F.3d 100, 105 (2d Cir. 2011) (quotations omitted); *accord Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015).  Forman has failed to proffer evidence showing any of these required elements.

## A. First Amendment Protections and Forman's Official Duties

The Court begins with the question of whether the First Amendment protects Forman's speech.  "Speech by a public employee is protected by the First Amendment only when the employee is speaking as a citizen on a matter of public concern." *Ross v. Breslin*, 693 F.3d 300, 305 (2d Cir. 2012) (quotations and alteration omitted).  A public employee must therefore show that "the employee spoke as a private citizen and the speech at issue addressed a matter of public concern." *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 95 (2d Cir. 2020) (alteration and quotations omitted).

Public employees do not speak as private citizens when they "make statements pursuant to their official duties." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  "The proper inquiry" into whether a public employee's speech was part of his or her official duties "is a practical one." *Id.* at 424.  A public employee's speech "can be pursuant to a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer" so long as the speech was "part-and-parcel of his concerns about his ability to properly execute his duties." *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 203 (2d Cir. 2010) (quotations omitted).  In other words, "speech that principally focuses on an issue that is personal in nature and generally related to the [employee]'s own situation or that is calculated to redress personal grievances . . . does not qualify for First Amendment protection." *Agosto*, 982 F.3d at 95 (quotations omitted).

To perform this analysis, "[c]ourts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." *Ross*, 693 F.3d at 306. "Other contextual factors, such as whether the complaint was also conveyed to the public, may properly influence a court's decision." *Id.* Yet even if a public employee shows that he spoke as a citizen on an issue of public concern, the analysis does not necessarily end. Under a defense established in *Pickering v. Board of Education of Township High School District 205, Will County, Illinois*, 391 U.S. 563 (1968), the governmental entity may still prevail if it shows that it "had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti*, 547 U.S. at 418. Under this analysis, "[a] government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." *Id.* And under a defense established in *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), "the government can avoid liability if it can show that it would have taken the same adverse action in the absence of the protected speech." *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011) (quotations omitted).

Before examining whether Forman engaged in speech protected by the First Amendment, the Court pauses to explain why speech before section 1983's three-year statute of limitations cut-off may be entitled to receive constitutional protection, but alleged acts of retaliation before that date may be considered only as background evidence. *See Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019) ("[E]xpiration of the [statute of] limitations period does not bar an employee from using the prior acts as background evidence in support of a timely claim." (quotations omitted)). Under section 1983, "the tort cause of action accrues, and the statute of limitations commences to run, when the wrongful act or omission results in damages." *Wallace v.*

*Kato*, 549 U.S. 384, 391 (2007).  Retaliatory action, not protected speech, is the wrongful act that

causes damages.  And so, "[t]he cause of action accrues not when [the] plaintiff utters the alleged

protected speech, but rather when he suffers retaliatory action as a result of that speech."  *Peterec*

*v. Hilliard*, No. 12 Civ. 3944 (CS), 2013 WL 5178328, at *6 (S.D.N.Y. Sept. 16, 2013).

Moving to the substance of Forman's claim, and liberally construing his *pro se* filings,

Forman argues that he engaged in protected speech when he:

(1) announced his intent to run, and then ran, for the United Federation of Teachers Chapter

Leader for HSLI;

(2) filed a safety complaint with other teachers about the March 28, 2016 incident

involving the student with scissors;

(3) represented a teacher during a grievance meeting in September 2015;

(4) convened union meetings in which he brought up matters of school safety and issues

involving the "curriculum, staffing, workload, tenure, safety, lead in the water, ESL

compliance, Special Education compliance, assessment, and other[] [things]";

(5) raised issues about staffing, instruction, the curriculum, and collaboration with

Nariman at monthly teacher consultation meetings; and

(6) objected to member selections for an unspecified committee.

Pl. 56.1 Stmt. ¶¶ 2, 8-9, 19, 28-31, 81-82, 92.

Defendants argue that none of these activities receive First Amendment protection.  *See*

Motion at 4-7; Reply at 2-5.  The Court agrees in part.  The safety complaint (number two above)—

which is the crux of Forman's claim—and his administrative complaints (numbers five and six

above) do not count as protected speech.  As explained shortly, the Court need not decide whether

the other instances of speech (numbers one, three, and four above) are protected by the First Amendment.

Starting with the safety complaint concerning the March 28, 2016 scissors incident, "it is beyond dispute that a teacher is responsible for protecting his or her own students and preventing inappropriate activity in his or her own classroom." *Fierro v. City of New York*, No. 20 Civ. 9966 (GHW), 2022 WL 428264, at *5 (S.D.N.Y. Feb. 10, 2022) (quotations and alteration omitted). Thus, district courts have regularly "granted motions to dismiss First Amendment retaliation claims brought by teachers and other school employees who allege retaliation for statements made to supervisors regarding classroom and school safety." *Id.* (quotations omitted). Nor has Forman identified how a dispute over an isolated school incident, for which the administration took a different view than Forman's account of the event, means that the incident "is of political, social, or other concern to the New York City community rather than an internal dispute of interest to employees." *Agosto*, 982 F.3d at 95 (quotations and alteration omitted).

Other undisputed facts bolster this conclusion that the safety complaint was an internal grievance. Forman signed the complaint by listing his title as a "Teacher," not as a union representative. Blair Decl. Exh. N at 3; Pl. 56.1 Stmt. ¶ 31. Each of the other seven teachers who joined the complaint similarly signed with their title as "Teacher." Blair Decl., Exh. N at 3. And the complaint voiced frustration that the administration did not accept Forman's version of the altercation, indicating that the signatories' main grievance was that the school's handling of the

incident undermined the trust between the teachers and the administration. *Id.*; Pl. 56.1 Stmt. ¶ 29.[9]

The safety complaint was thus "part-and-parcel of [Forman's] concerns about his ability to properly execute his duties as a public-school teacher" because of safety concerns in the classroom. *Weintraub*, 593 F.3d at 203 (cleaned up).  In other words, Forman's decision to challenge HSLI's handling of the incident, including how to discipline the student involved, "was a means to fulfill . . . his primary employment responsibility of teaching." *Id.* (quotations omitted).  Nor does it change the analysis that several teachers signed the safety complaint: complaints between labor and management "often have a strong flavor of personal grievance notwithstanding that the personal grievance is shared by numerous employees."  *Agosto*, 982 F.3d at 95 (quotations omitted).

For similar reasons, Forman's complaints about the school's administration also do not qualify as protected speech.  Again, these acts include Forman's raising of various pedagogic and personnel matters (*e.g.*, curriculum and staffing) with Nariman and his objection to the selection of members presumably for a school committee.  Bringing issues to Nariman about HSLI's staffing, the curriculum, committee membership, and similar administrative decisions are internal grievances and not protected by the First Amendment.  *See Weintraub*, 593 F.3d at 204; *see also Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 398 (2011) ("A petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context.").

---

[9] For instance, the complaint stated that the teachers "hope to move forward with greater transparency, collaboration, and mutual respect in the interests of ensuring a safe and healthy workplace for students and staff alike," and that they "would like to repair the fabric of trust that was broken by this incident and followup, which can only begin with an honest accounting of what happened."  Blair Decl., Exh. N at 3.

That leaves Forman's speech related to his union activities.  Because, as detailed below, the Court finds that Defendants took no adverse action against Forman nor has he shown any causal connection between any allegedly adverse action and his union-related speech, the Court need not decide whether the First Amendment protects that speech.[10]

## B.  Adverse Employment Action

The Court turns next to whether Forman has provided evidence that he suffered an adverse employment action within the statute of limitations.  Courts in this Circuit apply in First Amendment retaliation cases a standard substantially similar to the one articulated by the Supreme Court in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), for Title VII retaliation cases, considering whether the retaliation "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006) (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68); *see also Manon v. Pons*, 131 F. Supp. 3d 219, 232 n.8 (S.D.N.Y. 2015) ("The standard for an 'adverse action' in the context of First Amendment retaliation is substantially similar to the same inquiry in the Title VII retaliation context.").  In the First Amendment context, therefore, that means that

---

[10] "[I]t is far from clear that union membership by itself touches on a matter of public concern."  *Rutherford v. Katonah-Lewisboro Sch. Dist.*, 670 F. Supp. 2d 230, 251 (S.D.N.Y. 2009); *accord Gusler v. City of Long Beach*, 823 F. Supp. 2d 98, 132 (E.D.N.Y. 2011).  And with respect to Forman's representation of a teacher at a grievance meeting, not "all activities undertaken through a union necessarily become matters of public concern merely by virtue of their collateral connection to the union."  *Lynch v. Ackley*, 811 F.3d 569, 582 (2d Cir. 2016).  Thus, internal grievances, even when filed through the union, often will not receive First Amendment protection.  *See Agosto*, 982 F.3d at 95-96.  It follows that a public employee representing a teacher in an internal grievance also would be unlikely to receive First Amendment protection: if the employee's grievance does not touch on a matter of public concern, then why would representing that employee do so?  The same analysis would seem to apply for Forman's convening of union meetings, all of which involved internal school matters.  But because Forman's retaliation claim as to his union-related speech fails on adverse employment action and causation grounds, it is not necessary to reach these questions.

"[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Id.* at 225 (quotations omitted). This conduct includes "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Id.* at 226 (quotations omitted). But this list is "not exhaustive," so "lesser actions may also be considered adverse employment actions." *Id.* (quotations omitted).

Forman alleges only four incidents within the statute of limitations that he contends qualify as adverse employment actions: (1) he alleges that he was not hired to teach at DOE after the 2017-2018 school year, (2) HSLI deactivated his school email account after he went on voluntary leave in August 2016, (3) he received a "developing" rating in his annual review for the 2015-2016 school year, and (4) Defendants created a hostile work environment that forced him to resign after reaching the limit on years of voluntary leave. Pl. 56.1 Stmt. ¶¶ 27, 48, 54, 57, 75. None of these events count as an adverse employment action given the undisputed evidence. The Court will take each in turn.

First, Forman has provided no evidence showing that he was denied employment with DOE for the 2017-2018 school year after he voluntarily left HSLI. On the contrary, soon after Forman submitted applications for other jobs at DOE, he accepted a job at SUNY. Pl. 56.1 Stmt. ¶ 68. To recap, Forman reached out to a few DOE schools to inquire about open positions in May 2017. *Id.* ¶¶ 62-67. This entailed applying for three jobs through DOE's hiring system in early- and mid-May 2017, including an ESL teaching position with Pan American International High School, and applying to several schools directly. *Id.* ¶¶ 66-67. Two days after applying for that ESL position at Pan American International School, Forman was offered a job as an Adjunct Instructor at SUNY Empire State College. *Id.* ¶ 68. He evidently was eager to accept that position at SUNY as, the

very next day, May 16, he advised DOE of the employment offer and submitted an application for another year of leave.  Blair Decl., Exh. Z at 1; *see* Pl. 56.1 Stmt. ¶ 70.  Forman's email to DOE said that if the agency did not "approve[] the leave[,] . . . [he] w[ould] be returning to work either at HSLI or another school."  Blair Decl., Exh. Z at 1.  DOE approved Forman's leave request, *see id.*, Exh. T at 3, and he chose not to return to work for DOE that school year, instead taking the job at SUNY.  In sum, nothing suggests that DOE ever denied him employment in the short time between his application for DOE jobs and his acceptance of the Adjunct Instructor position at SUNY.  Plus, as Forman himself noted in his May 16 email to DOE, because he was on voluntary leave, he could have just returned to teach at HSLI.  *See id.*, Exh. Z at 1.

Second, the act of HSLI deactivating Forman's school email account does not qualify as an adverse employment action.  Losing access to a work email address would not dissuade a reasonable employee from exercising his or her constitutional rights.  *See Cunningham v. Consol. Edison Inc.*, No. 03 Civ. 3522 (CPS), 2006 WL 842914, at *18 (E.D.N.Y. Mar. 28, 2006) ("Defendant's suspension of plaintiff's e-mail address . . . does not rise to the level of an adverse employment action."); *Sekyere v. City of New York*, No. 05 Civ. 7192 (BSJ), 2009 WL 773311, at *4 (S.D.N.Y. Mar. 18, 2009) ("Defendants' delay in providing Plaintiff with an email address . . . [is] not of sufficient significance to amount to . . . adverse changes in the terms and conditions of Plaintiff's employment.").  That is especially true when, as here, the school deactivated Forman's school email address *after* he had left HSLI and Forman was informed that the school was doing so for *all* inactive teachers for the 2016-2017 school year.  Pl. 56.1 Stmt. ¶ 60.

Nor has Forman pointed to any harm he suffered from the deactivation of his HSLI email account.  *Id.* ¶¶ 47, 58.  After Forman reached out to Nariman about his inability to access his HSLI email account, the school reactivated the account so that he could retrieve any files he

needed. *Id.* ¶¶ 58, 60.  And Forman was still able to use his DOE email address after his HSLI account was deactivated. *Id.* ¶ 58.  In short, a reasonable employee would not feel deterred from exercising his constitutional rights when his place of employment deactivated his email account after he stopped working there, particularly where he was allowed to retrieve any files on that account and still had an email account through his overall employer.

Third, Forman's "developing" rating from his annual review does not count as an adverse employment action.  For one, there are timeliness issues with that rating.  While Forman received the final performance rating on September 1, 2016, two days after the statute of limitations cut-off of August 30, 2016, his argument is that Defendants retaliated by giving him lower classroom observation scores, which in turn triggered a lower overall score.  *See Id.* ¶¶ 48, 113; Opposition at 17.  Those classroom observations, however, took place before the statute of limitations cut-off and therefore cannot support his retaliation claim.  *See* Blair Decl., Exh. L at 2 (October 19, 2015 observation), 7 (December 21, 2015 observation), 12 (March 15, 2016 observation), 19 (April 19, 2016 observation); 9/16/20 Opinion at 3 ("Disciplinary proceedings and poor performance evaluations are 'discrete acts' that do not trigger the continuing violation doctrine."); *Zoulas v. New York City Dep't of Educ.*, 400 F. Supp. 3d 25, 54 n.6 (S.D.N.Y. 2019) (classroom observations that caused a teacher to receive a "developing" rating "likely occurred before [the statute of limitations cut-off] and, therefore, cannot support [the teacher]'s [Title VII] claim"); *Siddiqi v. New York City Health & Hosps. Corp.*, 572 F. Supp. 2d 353, 366 (S.D.N.Y. 2008) (recognizing that "[e]ach negative performance evaluation is a discrete act"); *Smith v. New York City Dep't of Educ.,* No. 09 Civ. 9256 (DLC), 2011 WL 5118797, at *5 (S.D.N.Y. 2011) (recognizing that "an unsatisfactory rating following a classroom observation" is a discrete act and thus does not fall within the continuing violations doctrine).  And to the extent that Forman challenges the MOSL

scores, the same would hold true.  The students took the tests underlying these scores before the statute of limitations cut-off.  *See* Blair Decl., Exh. W at 1 (July 18, 2016 email between Wang and Forman discussing the test scores).  Thus, the only events that plausibly took place within the statute of limitations period would be the calculation of Forman's overall rating.  Forman does not, however, claim that Defendants retaliated against him through the performance of this clerical task.[11]

But even if the classroom observations or the MOSL scores were timely, the annual review would not qualify as an adverse employment action.  "[A] negative performance review, without more, does not represent an adverse employment action."  *Chung v. City Univ. of New York*, 605 F. App'x 20, 22 (2d Cir. 2015); *accord Fairbrother v. Morrison*, 412 F.3d 39, 56-57 (2d Cir. 2005) (surveying cases and finding that a negative evaluation was not adverse when the plaintiff did not assert harm to her salary, benefits, or title), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53; *Assue v. UPS, Inc.*, No. 16 Civ. 7629 (CS), 2018 WL 3849843, at *12 n.15 (S.D.N.Y. Aug. 13, 2018) ("Negative evaluations standing alone . . . do not constitute adverse employment actions."); *Mira v. Argus Media*, No. 15 Civ. 9990 (RJS), 2017 WL 1184302, at *4 n.5 (S.D.N.Y. Mar. 29, 2017) ("Without more—such as allegations of a detrimental effect on salary, benefits, or title—a negative performance evaluation alone does not constitute an adverse

---

[11] The closest that Forman comes to making this argument is his "vague memory" that the student list for his MOSL score was not accurate because he did not understand, for instance, why a certain student's score was included in his rating.  Pl. 56.1 Stmt. ¶ 53.  Yet Forman has put forward no evidence suggesting that Defendants incorrectly included any students when calculating his MOSL score.  And Forman acknowledges that in his deposition he never "state[d] he believes [that] Nariman and Wang 'gave' him a 'developing' MOSL score."  *Id.*  Instead, Forman criticizes that there is "little transparency" in calculating MOSL scores.  *Id.*  Forman thus has not provided sufficient evidence to show an adverse employment action, and a nonmoving party's "conclusory allegations or unsubstantiated speculation" cannot defeat summary judgment.  *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quotations omitted).

employment action."). Forman has shown no harm resulting from the "developing" performance review. Forman voluntarily ceased teaching at HSLI, and he has provided no evidence of DOE subsequently denying him employment. Instead, he chose to take leaves from DOE so that he could work at CUNY and later at SUNY. Pl. 56.1 Stmt. ¶¶ 43, 111. And he then opted to stop working for DOE to work at SUNY. *Id.* ¶¶ 75-76. Without any harm arising from his performance review, Forman did not experience an adverse employment action.

Fourth, Forman's claim that the retaliation entailed a work environment that amounted to a constructive discharge lacks merit.[12] A constructive discharge occurs "when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Serricchio v. Wachovia Sec. LLC*, 658 F.3d 169, 185 (2d Cir. 2011). A work atmosphere becomes intolerable if it is so "difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Id.* To bring a constructive discharge claim, an employee must explore other options before quitting: "[a]n employee who fails to explore alternative avenues offered by her employer before concluding that resignation is the only option cannot make out a claim of constructive discharge." *Simmons-Grant*

---

[12] Neither party cites Second Circuit caselaw establishing that a constructive discharge counts as an adverse action under the First Amendment. Other circuits, however, have so held. *See, e.g.*, *Buddenberg v. Weisdack*, 939 F.3d 732, 740 (6th Cir. 2019) ("Constructive discharge may also constitute an adverse action for First Amendment purposes."); *Akins v. Fulton Cnty., Ga.*, 420 F.3d 1293, 1300-01 (11th Cir. 2005) ("Constructive discharge negatively affects an employee's job status, and therefore constitutes an adverse employment action."). The Court assumes that a constructive discharge could count as an adverse action here because, as noted, courts analyze adverse employment action in the First Amendment retaliation context in a similar manner as they do for Title VII retaliation claims. *See Zelnik*, 464 F.3d at 227; *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir. 1999) (retaliatory co-worker harassment may constitute adverse employment action under Title VII), *abrogated on other grounds by Burlington N. Santa Fe Ry. Co.*, 548 U.S. 53.

*v. Quinn Emanuel Urquhart & Sullivan, LLP*, 915 F. Supp. 2d 498, 506 (S.D.N.Y. 2013) (quotations omitted).

Forman has not pointed to any events within the statute of limitations that created an intolerable work atmosphere. Receiving a poor performance review and having an email address deactivated, while perhaps "unpleasant" to Forman, do "not . . . rise to the level of objectively intolerable." *Id.* at 507. Nor did the actions by the school before the limitations period create an intolerable work environment that could have continued into the limitations period. Poor teacher evaluations, a summons to a disciplinary meeting, and taking a different view of an internal safety incident all fall short of amounting to an objectively intolerable work environment. *See Brown v. New York City Dep't of Educ.*, No. 20 Civ. 2424 (VEC) (OTW), 2021 WL 4943490, at *12 (S.D.N.Y. Aug. 31, 2021) ("[C]ourts in this Circuit have consistently held that allegations of even constant reprimands and work criticism by themselves are not sufficient to establish a hostile environment claim." (quotations and alteration omitted)), *report and recommendation adopted*, 2021 WL 4296379 (S.D.N.Y. Sept. 20, 2021).

Yet even if Forman had shown an intolerable work atmosphere, his claim would still fail because he did not avail himself of alternative avenues. Again, nothing suggests that DOE would have prevented Forman from working as a teacher at another DOE school. On the contrary, Forman voluntarily requested and received leaves of absence, chose to work at SUNY, and then years later quit DOE, opting to continue to work at SUNY rather than exploring other employment options with DOE. *See Livingston v. City of New York*, No. 19 Civ. 5209 (KPF), 2021 WL 4443126, at *16 n.17 (S.D.N.Y. Sept. 28, 2021) ("[G]iven that Plaintiff chose to resign rather than to return to work after being granted his requested accommodation, the Court finds that he did not avail himself of 'alternative avenues.'"); *Baptiste v. Cushman & Wakefield*, No. 03 Civ. 2102

(RCC), 2007 WL 747796, at *12 (S.D.N.Y. Mar. 7, 2007) (finding no constructive discharge where the employee began looking for work months before resigning and then waited nearly two weeks after accepting new employment to formally tender her resignation).  Forman also admits that he "probably" would have stayed with DOE if he could have extended his leave of absence yet again.  Pl. 56.1 Stmt. ¶ 75.  Under these circumstances, no reasonable jury could conclude that Forman's working conditions were so intolerable that he was forced to resign.

Lastly, to the extent Forman's claim is liberally construed to allege a hostile work environment separate from circumstances giving rise to a constructive discharge, this too fails.  In the Title VII context, which the Court assumes applies here, "a retaliatory hostile work environment may . . . constitute [an] adverse employment action."  *Marquez v. City of New York*, No. 14 Civ. 8185 (AJN), 2016 WL 4767577, at *13 (S.D.N.Y. Sept. 12, 2016) (Title VII context); *accord Richardson*, 180 F.3d at 446 (in the Title VII context, "unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action so as to satisfy the second prong of the retaliation *prima facie* case"), *abrogated on other grounds by Burlington N. Santa Fe Ry. Co.*, 548 U.S. 53; *Dawson v. Cnty. of Westchester*, 351 F. Supp. 2d 176, 194 (S.D.N.Y. 2004) ("Because there are no clearly articulated standards in this Circuit with respect to hostile work environment claims under § 1983, [courts] must look to Title VII for significant guidance." (quotations omitted)).  To show that a retaliatory hostile work environment meets this requirement, an employee "must satisfy the same standard that governs standalone hostile workplace claims."  *Marquez*, 2016 WL 4767577, at *13 (quotations and alterations omitted).

An employee therefore must show that the "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Sys.,*

*Inc.*, 510 U.S. 17, 21 (1993) (quotations and citation omitted). This requirement "has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014). For the objective component, "[t]he incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (quotations omitted). In performing this analysis, "courts must assess the totality of the circumstances, considering elements such as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quotations omitted).

Here, Forman has failed to show that Defendants created a hostile work environment. To begin with, Forman claims that the "most egregious" behavior that Defendants subjected him to was him receiving "developing" evaluations from Nariman. Opposition at 19. Again, Nariman's evaluations of Forman based on class observations happened before August 30, 2016. But even if the evaluations were not time-barred, "[a]llegations of negative job evaluations or excessive reprimands are insufficient to establish a hostile environment claim." *Perez v. New York State Off. of Temp. & Disability Assistance*, No. 14 Civ. 1621 (SAS), 2015 WL 3999311, at *7 (S.D.N.Y. June 30, 2015) (quotations omitted).

Nor do Forman's other claims support his hostile work environment argument. Forman now argues in opposition to summary judgment—and without providing evidence to this effect— that Nariman glared at him through his classroom window, Nariman refused to shake his hand, Defendants gave him none of his teaching preferences for the 2016-2017 school year, Defendants

27

excluded him from the school's hiring committee, Defendants did not directly communicate with

him, and Defendants subjected his students' "test scores to unique scrutiny." Opposition at 15-16.

It appears that all these alleged events would have occurred before the statute of limitations period.

But in any event, none of these events, taken together, were "sufficiently severe or pervasive to

alter the conditions of [Forman]'s employment and create an abusive working environment."

*Harris*, 510 U.S. at 21 (quotations omitted). These events were instead "episodic and not the type

of conduct that courts find create severe or pervasive hostile work environments." *Harewood v.

New York City Dep't of Educ.*, No. 18 Civ. 5487 (KPF), 2021 WL 673476, at *29 (S.D.N.Y. Feb.

22, 2021) (quotations omitted) (rejecting hostile work environment claim where the defendants

"change[d] . . . [the plaintiff's] lunch period, [did not approve the plaintiff's] book-making

program, and hassl[ed] her about the elevator key").[13] In sum, after considering all these instances

under the totality of the circumstances, Forman failed to offer evidence of a hostile work

environment that creates a genuine dispute of material fact.

---

[13] *See also Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015) (dismissing a hostile work environment claim based in part on the defendant's negative and sarcastic statements towards the plaintiff, replacing the plaintiff at meetings, wrongfully reprimanding the plaintiff, and increasing the plaintiff's workload); *Brenner v. City of New York Dep't of Educ.*, 659 F. App'x 52, 54-55 (2d Cir. 2016) (affirming grant of summary judgment to the defendants on a hostile work environment claim when the defendants made a handful of negative comments about older, white Jewish teachers and reassigned the plaintiff to a "closet" instead of dedicated classroom); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226 (E.D.N.Y. 2012), *aff'd,* 713 F.3d 163 (2d Cir. 2013) (granting summary judgment to the defendants on a hostile work environment claim when the defendants increased the plaintiff's classroom observation, issued negative performance evaluations and adverse letters for the plaintiff's file, made frequent changes to the plaintiff's room assignments, and assigned tougher students to the plaintiff); *Self v. Dep't of Educ. of the City of New York*, 844 F. Supp. 2d 428, 435, 439 (S.D.N.Y. 2012) (stating in dicta that the plaintiff's complaints about being afforded less time to grade an exam than another teacher, being assigned less desirable classes, not being selected to attend a conference, and the school's pursuit of a disciplinary charge against her based on student complaints of verbal abuse and corporal punishment were insufficient to establish a hostile work environment).

### C.  Causation

Lastly, even if Forman could establish adverse employment action, he has failed to show causation.  "To establish causation, a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action."  *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed.*, 444 F.3d 158, 167 (2d Cir. 2006) (quotations omitted); *accord Mt. Healthy City Sch. Dist. Bd. of Educ.*, 429 U.S. at 287.  A plaintiff may show causation "directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action."  *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015).  A plaintiff may not, however, "rely on conclusory assertions of retaliatory motive to satisfy the causal link."  *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004).

Under this framework, Forman has not shown that speech related to his union activity was a substantial motivating factor in any of the supposedly adverse employment actions.[14]  One instance that Forman claims caused the adverse employment actions was his convening of a union meeting on April 14, 2016.  *See* Dkt. 78-16 at 2.  Forman points only to the temporal proximity between the meeting and the "adverse" events to suggest causation—he identifies no other circumstantial evidence to support a causal link.  Yet any non-time-barred adverse action would have had to occur on or after August 30, 2016, which is the start of the limitations period and also the date when Forman's HSLI email account was deactivated.

This gap of four-and-a-half months between the protected speech and the alleged retaliation is too long to infer causation in these circumstances.  While the Second Circuit in *Espinal v. Goord* permitted an inference of causation despite the passage of six months between the protected speech

---

[14]  And as held above, Forman's other conduct plainly is not protected by the First Amendment.

(filing a lawsuit against New York State Department of Correctional Services officials) and the alleged adverse action (excessive force and denial of medical treatment in prison), other evidence in that case suggested a causal link.  558 F.3d 119, 129-30 (2d Cir. 2009); *see Specht v. City of New York*, 15 F.4th 594, 605 (2d Cir. 2021).  In particular, the officers who allegedly retaliated against the plaintiff-inmate told him that "this is what happens to [i]nmates when they submit lawsuits against us." *Espinal*, 558 F.3d at 122 (quotations omitted).  When, however, there is no other evidence supporting causation, the maximum time to infer causation decreases.  Thus, "[c]ourts in this Circuit have held that the passage of two months between protected activity and adverse action can be too long, without more, to support an inference of causation." *Gilford v. N.Y.S. Off. of Mental Health*, No. 17 Civ. 8033 (JPO), 2020 WL 1529359, at *4 (S.D.N.Y. Mar. 31, 2020).  Here—unlike *Espinal*—no facts suggest that Defendants retaliated against Forman on or after August 30, 2016 for convening a union meeting on April 14, 2016.  The four-and-a-half-month gap, without more, is therefore too significant to show a causal link.

For similar reasons, Forman's representation of a teacher in a September 2015 grievance meeting lacks a causal connection to any alleged non-time-barred retaliation.  Again, Forman points to no evidence suggesting Defendants retaliated against him for representing that teacher besides the temporal proximity, which was approximately seven months longer than his act of convening the April 14, 2016 union meeting.  This "nearly a year" gap between the protected activity and alleged retaliation cannot imply a causal connection. *Birch v. City of New York*, 184 F. Supp. 3d 21, 32 (E.D.N.Y. 2016), *aff'd,* 675 F. App'x 43 (2d Cir. 2017).

The same analysis applies to Forman's candidacy for his union's Chapter Leader at the school.  Forman ran for the position in June 2015, fourteen months before any non-time-barred alleged retaliation. Pl. 56.1 Stmt. ¶¶ 8-9, 19.  The only other evidence that Forman suggests shows

a causal link to his union activities are Wrightman's alleged statement in May 2015 that "something might happen" to Forman if he ran for Chapter Leader, Wang's alleged comments in mid-2014 and September 2015 that "some people spend too much time on union activities," and Nariman's alleged comments in March 2016 and April 2016 that the union can be divisive and teachers should bring problems to the administration rather than to the union.  Pl. 56.1 Stmt. ¶¶ 6-7, 20, 25, 32.[15]  These comments, combined with the substantial gap of time between the protected speech and the alleged retaliation, do not allow for an inference of causation.  *See Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 314 (2d Cir. 2005) (holding that the plaintiff failed to establish causal nexus because more than a year passed between the protected activity and the adverse employment action); *Birch*, 184 F. Supp. 3d at 32 ("[I]t is the rare case that finds a plausible claim when nearly a year rather than months have gone by.").[16]

## IV.  Conclusion

For all the reasons given, the Court grants Defendants' motion for summary judgment.  The Clerk of Court is respectfully directed to close this case and mail a copy of this Opinion and Order to the *pro se* Plaintiff.

SO ORDERED.

Dated: March 28, 2022
New York, New York

_____
JOHN P. CRONAN
United States District Judge

---

[15] Forman also points to a few other statements allegedly made by Nariman and Wang: (1) Wang told Forman that "you don't work here anymore" after he went on leave and (2) Nariman told Forman, "I can't protect you," if he advocated to the superintendent that the school should switch away from relying on exam scores.  Pl. 56.1 Stmt. ¶¶ 46, 111, 119.  None of these statements, however, suggest retaliatory animus towards union members.

[16] Because Forman failed to make out a *prima facie* case of retaliation, the Court need not consider whether Defendants "establish[ed] [their] entitlement to a relevant defense" to liability, such as the *Pickering* defense or the *Mount Healthy* defense.  *Anemone*, 629 F.3d at 114.